Thank you, Your Honor. May it please the court. Good morning. My name is Bruce Brine. I represent Ms. Tydingco for the second time. I would like to try to reserve three minutes for rebuttal if I may. Thank you, Your Honor. Your Honor, this really is a case about fairness, whether it was proper to allow highly prejudicial evidence in support of a weak case for harboring an illegal alien. I plan on focusing my time here on what I believe are the three most important issues involving the most important government witnesses in this appeal, Officer Munoz and Doris Castro. But first, let me address the other four witnesses. The government called six in total. Customs Border Patrol Officer Trish Ogden, she was the primary CBP inspection officer who initially met the Tydingcos and Zing Yi, the minor, when the Tydingcos brought her to Saipan. Due to the massive amount of people that she processes through She remembers nothing about Ms. Tydingco and Zing Yi. But apparently, you know, even despite that she took the Tydingcos or Ms. Tydingco and Zing Yi to secondary inspection, because out of, you know, normal concerns about kidnapping whenever a minor is not with their parents. HSI Homeland Security Special Agent Nicole Sibley was brought in solely to testify about Ms. Tydingco's A-file. Case Agent DeBrawl was involved after Zing Yi arrived in Saipan and testified about the investigation and interrogation of Ms. Tydingco. And Zing Yi herself testified. But at the time she entered Saipan or the CNMI, she didn't understand English. So she had very little to say other than she lived with the Tydingcos, went to This leaves Officer Munoz and Doris Castro. The government used both of these witnesses to introduce highly prejudicial evidence that the jury should have never heard because this evidence was just absolutely unreliable. Officer Munoz's testimony was unbelievable, full of that he remembered the encounter, even though it happened six years ago, that they came in in September 2013. The trial, the second trial was September 2019. Officer Munoz didn't testify for the first trial. The encounter that he had interviewing Ms. Tydingco lasted about five to 10 minutes. Officer Munoz testified that he remembered interviewing Ms. Tydingco and the young female and stated that Ms. Tydingco referred to Zing Yi as her niece and remembered that she said Zing Yi was staying about 30 days in the CNMI. Testimony that undeniably bolstered the government's case against Ms. Tydingco. Then Officer Munoz admits that his memory was cloudy. He said he remembers Ms. Tydingco clearly, but could not identify her in the courtroom and finally admitted that the information that he was testifying to really was learned by him through various meetings with the government in preparation for his testimony. Counsel, those are all reasons for the jury not to believe him, but he was there. He's testifying about what he says he remembered happened. Why can't he do that? And you did on cross-examination point out all the reasons why that should be disbelieved. What's wrong with that? Yes, your honor. I mean, the real point and the real problem with it is that he admitted that he used some unidentified person to assist him in translating the interview that he had with Ms. Tydingco. He was unable to remember any qualities of this person who assisted him in the translation other than she was female and wore a uniform. Additionally, he was unable to remember what exactly that Ms. Tydingco said was translated from Chinese to English. He said, oh, it was a 50-50 chance. So we have no idea of what testimony that he was talking about was actually translated. But we've said, I mean, we've said that, you know, the point about the reliability of the translator is a legitimate concern. We've said, you know, the court's supposed to look on a case-by-case basis to figure out, you know, if it's reliable. And here, you know, even though we don't know anything about the translator, we do know that Ms. Tydingco apparently speaks English well enough that I believe she said she didn't want a translator. So why isn't that enough for the district court to have decided that it was reliable? Yes, your honor. I mean, I think that's one factor out of four factors in, and I'm going butcher this name, but in the Nazimian case that was followed by Orm Heung and Romo Chavez, and these cases were after Washington v. Crawford, and that case was progeny that required confrontation under the Sixth Amendment. So the problem with that is that factor alone is insufficient to show reliability of this evidence. There were additional factors in the Nazimian case that the government had to show in order to do an end run around Washington v. Crawford's requirements. We know that some of this court's judges are starting to question the viability of Nazimian in light of Crawford. And I don't know, I had a discussion, there was just yesterday a new Sixth Amendment right to confrontation case that came down from the Supreme Court. In other words, the U.S. Supreme Court is with Washington v. Crawford both calming the Mendez case, and now Hemphill v. New York is really emphasizing the importance of the confrontation clause, the ability to cross-examine these people that are critical to testimony, improving the government's case. And I think that if Nazimian is viable after these cases, that the government must show these elements with exceptional rigor and exceptional evidence in order to do an end run around the confrontation clause. And they have- May I ask? Yes. Counsel, I'm interested in the Castro testimony. Would you address that? Why couldn't the evidence of the sham marriage be brought into the case here? Yes. Ms. Castro admitted the worst 404B evidence was the alleged marriage fraud evidence, Your Honor. Ms. Castro was an admitted ICE addict at the time this supposed alleged marriage fraud was happening and was actively using crystal methamphetamine. She admitted that it seriously affected her memory. The only evidence of Mrs. Tydenko's involvement in this alleged attempted marriage fraud that Ms. Castro provided was that Ms. Castro said, Ms. Tydenko, introduce me to Mr. Liu. Mr. Liu was the person who she was allegedly supposed to connection, the only evidence of Ms. Tydenko's involvement with this alleged attempted marriage fraud. If the attempted marriage fraud existed, then it was between Mr. Liu and Ms. Castro. There was no evidence of a marriage license, a signed marriage license, no money was paid, no marriage happened. Mr. Liu did not testify. In fact, Ms. Castro specifically testified that it was Mr. Liu who was going to pay her money, not Ms. Tydenko. If the government fails to show Ms. Tydenko was involved in this attempted marriage fraud, then it's not admissible as 404B. Well, suppose we agree with you on that. Why was it prejudicial? I mean, the government barely mentioned it in closing argument. I'm not sure it really even referred to this testimony specifically. It just sort of mentioned Castro, but that was about it. And then there was a limiting instruction. So what's the prejudice given that? Yes, Your Honor. The government mentioned that in order to downplay the admissibility of this 404B, her direct took only eight pages of the transcript and the government barely mentioned it in the closing. The government talks about that in its brief at page 24 to 25. But earlier, the government claims that Rebecca's testimony made its case even stronger than it was in Tydenko when it was arguing in its brief on the issue of sufficiency of the evidence. This is a case about intent, really. There's no dispute that Zing Yi was here in Saipan. There's no dispute that the Tydenkos brought her here to go to public school. The evidence of illegal harboring of her, Ms. Tydenko's intent to violate the immigration laws was weak. We had plenty of other evidence that showed she had a guardian form that she provided to the CBP officer, had a conversation with the CBP officer, took it to the Commonwealth Recorder's office, had it publicly recorded, enrolled her in public school, and on and on and on. So this highly prejudicial 404B evidence had to have a major effect on the jury. It's like, well, if she was involved in this attempted marriage fraud that is somewhat related to, according to the government, the same as harboring or immigration offenses, then she must be guilty. And that's why we have this special exception for 404B evidence, and that it's basically not favored. And there's certain tests to get it in, Your Honor. So yes, that's why it's so prejudicial, because this case is about intent, and it's very subjective and all circumstantial. It has to be, because it's an intent case. I hope that did that answer your question, Your Honor. And you're down to about two minutes. So I think that's, I will stay there. I'll just add on the Rebecca Castro 404B marriage fraud, there was no evidence of time to connect when it happened. But thank you. Thank you. We'll hear from the government now. Good morning. May it please the court. Garth Backe on behalf of the United States. As argued in the government's answering brief, the government contends the evidence was sufficient. The jury instructions were proper. There were no abuses of discretion by the lower court in its evidentiary rulings. If there were errors, they were all harmless. I don't have much to add to my brief other than to point out a correction, as well as highlight the government raises three critical points. First, the correction, the government failed to indicate that Ms. Tedenko went to trial on the second superseding indictment, which was provided by defense as excerpt 699. But the importance of that is that the second superseding indictment alleged that the crime began on the date of entry, instead of when she fell out of status. We did not highlight in that in our answering brief, I just wanted to point that out to the court. Now, the government also would just like to point out the difference in evidence between Tedenko one and Tedenko two. In Tedenko two, this case, we had Mr. Munoz, the secondary inspection officer testify. You know, he testified about the inspections, the questions he asked and the and he was, as the court is aware, is subject to extensive cross-examination. In this case, the government also had the 404B witness, it's Rebecca Castro. We think her evidence was appropriate and or harmless. Can I ask you, why was it appropriate? I mean, as I understand it, the main issue here is, did she understand that the child XM was going to be out of status and that it wasn't legal for her to stay after whatever the initial period of entry was? How does her involvement in Castro's for money, for immigration purposes, establish what she did or didn't know about XM? Well, again, it's one of her key defenses that she doesn't understand the CP program, the requirements to leave for XM had to leave about visas. She thought everything she was doing, but there's evidence that she knows the immigration system. I mean, she was a permanent legal resident herself. She submitted numerous applications. So, but it shows that she also knows how to prevent immigration laws and her facilitation of this marriage. If I may interrupt, those are totally different type of immigration offenses in terms of actual general knowledge. I mean, you know, marrying a citizen or, you know, sham marriage, that's kind of well-known to trope in movies, books, et cetera. You know, student visa, that is very esoteric and complex. I don't think you can somehow, that's like saying, you know, someone committed murder and they are aware of it, but, you know, and equating that with some tax violation, esoteric tax violation, it seems to be very, very different. So to infer knowledge of some very esoteric immigration law from something that's so obvious. I mean, it seems like the only thing it really does is the propensity here. Yeah, I disagree. And I think the fact that XM needed some lawful status is obvious. I mean, that's, I don't think there's anything esoteric about the fact that you need to have permission from the United States to have a Chinese citizen stay in the country for a year and a half. But the marriage fraud evidence that it was couched as, that was XM's uncle who was residing in her house. And she was, again, it's another instance of her facilitating the circumvention of U.S. immigration laws. And it's reasonable to infer she did it for money. I mean, why would she introducing these people, a recently arrived Chinese national to a local individual to get married and they don't even know each other. But to the extent that that probably does sound like, I'm sorry, I was just going to ask counsel on that very point. What does that have to do with the immigration statute? Again, we are offering, we offered it for intent and knowledge. That she understands the system and she understands how to circumvent it. If I may, to the extent the court thinks it's prejudicial. Well, and just before you get to that, that understands how to circumvent it seems like precisely the problem. I mean, that seems like a propensity argument. Because you broke the law in this other case, we should infer that you were breaking the law in this case. So she, her, her, through her written statement, she was trying to say it was a one-off favor for a friend that the housing of, of XM. And in some ways it helped, it helped counter her, her written statement that she provided that this wasn't one, one off favor for a friend. To the extent the court finds that it was improperly admitted and the court would, then the government would then say that it was harmless. Again, for the reasons it was barely mentioned, it took up a little amount of time. The district court in this case instructed the jury, gave a cautionary instruction before the testimony, immediately before the testimony, immediately after the testimony, and again, during final jury instructions. And the court has recognized that we, I mean, it's black letter law that juries are expected to follow the instructions that are given. There's no reason to believe that this would inflame the jury to it, to under 403, such that they would reach an unjust verdict based on this evidence. And again, the way that the evidence outside of the 404B supports a finding that it was harmless. Counselor, was this evidence introduced in Tadinko 1? No, your honor. It was intended to. Why did you decide to bring it in to Tadinko 2? You had a good enough case, did you not, without it? She was, she was called as a witness in Tadinko 1. Mr. Rong, you was a witness, was supposed to be a witness in Tadinko 1. He, I guess, the government did not end up calling him. Ms. Castro did not respond to the subpoena. They issued a bench warrant for her for the first trial. So she didn't testify in the first one, but the government, it was their original expectation that she would. Another thing that I think is important because there's certain parts of the opinion in Tadinko 1, which I think misstate the facts. And I want to clarify that. The letter of authorization that the jury saw, which says that they are the guardians. So for her period of study, that letter of authorization was obtained from the public school system. There is no evidence that that is the letter of authorization that was shown to CBP upon their entry. I asked the CBP officer if he had any memory of any school. He said, no, that he would inputted that into his database. Had that, is that, if that's what the letter would have said, he's never advised anyone to file anything in any court system. So the Tadinko 1 seemed to think that that was the letter that mentioned studies that was shown to the CBP officer. There is no evidence to support that. And just in regards to the defense counsel's argument about the translator issue and her statements made to CBP. Again, this Ms. Tadinko speaks English that was testified to by Ms. Castro, that was testified to by the agent. Even the secondary inspection officer said she spoke English half the time. But these, these, his primary defense counsel's primary complaint is the statements that about being an aunt or being an aunt, sorry. And that statement is that Ms. Tadinko referred to her as aunt or auntie in public. Furthermore, Ms. Tadinko's husband listed himself as ex-aunt's uncle on one of the registration forms. So there is corroboration for Mr. Munoz testimony about the translators that was allegedly brought through the translator. Also, the government in this case highlighted the fact in Tadinko 1, the court seemed concerned that Ms. Tadinko did not fully appreciate the ramifications of an I-94 and what it meant. In Tadinko 1, the government just introduced her entire A file in one, I think it's 180 pages. In this case, we broke up her applications into separate exhibits. One of those exhibits, government's exhibit 11, which is a supplemental excerpt of record 54, was Ms. Tadinko's own request for an extension of her parole status, wherein she submitted her own I-94. And she submitted that letter personally without the assistance of a lawyer and in English. So she did understand the I-94 and we tried to highlight it in better detail in Tadinko 2. That is all I have as to argue. Again, we rest on our brief and the arguments made in the government's brief and I just have stayed here to answer any questions the panel might have. Do either of my colleagues have any questions? All right, thank you. All right, and Mr. Merline, you have just under two minutes. Thank you, Your Honor. Quickly, I would agree that this is a, for the 404B, this is a propensity argument. Immigration law is esoteric. Immigration law is extremely complicated. That was admitted by Agent Agun and I think Agent DeBraw, we had several questions about how complicated and they understand it or not and they don't understand it. The government provided no evidence showing adequate involvement into the alleged marriage fraud or connected that introduction in any temporal way. When did that introduction happen? No evidence of it. That 404B evidence should have never come in and it was highly prejudicial. Quickly, running back to the translator issue, Your Honors, again, you know, the government says, well, there was corroboration, but there's three other factors that in its brief, in an effort to meet these factors, the government states the translator was professional, provided for and a native speaker of the language that was translated. Government's brief at 27. Every one of these claims are baseless and unsubstantiated by the evidence at trial. No one testified to that. The only one that could have testified to it was Agent Munoz and he had no recollection. That evidence, the translator should have been called. We should have had an opportunity to cross examine that translator without meeting those factors. Finally, on the A file, there's evidence she used an attorney. There's no evidence that she submitted that letter without the guidance of an attorney. Thank you very much, Your Honors. Thank you. We thank both counsel for their helpful arguments this morning or tomorrow morning. The case is submitted. Our last case.
judges: O'SCANNLAIN, MILLER, LEE